# UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF FLORIDA

# JACKSONVILLE DIVISION

| | |
|---|---|
| ERIC CONTESSA, as Personal Representative of the Estate of Vincenzo Luciano Contessa, deceased,<br><br>     Plaintiff,<br><br>v.<br><br>WHITE PINE INS. CO.,<br><br>     Defendant. | 3:23-cv-00487-JAR-PDB<br><br>OPINION AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT |

## INTRODUCTION

This case arises out of a fatal motor vehicle collision that occurred on July 26, 2018, on Interstate 295 South in Duval County, Florida. Victor Palma ("Mr. Palma"), while delivering food as an agent of a restaurant, Qian Y. Zheng, Inc. ("QYZ"), collided with Vincenzo Luciano Contessa ("Mr. Contessa"), who died as a result of the collision. Eric Contessa, as the Personal Representative of the Estate of Vincenzo Luciano Contessa ("Contessa"), brought an action against QYZ in the state circuit court, and the two parties agreed to a binding arbitration. The Arbitrator found in favor of Contessa, awarding the principal sum of $12,499,389.10, and the state circuit court subsequently entered a judgment incorporating the Arbitrator's findings of fact and conclusions of law.

Case No. 3:23-cv-00487-JAR-PDB

Now, by means of a <u>Coblentz</u> agreement,[1] Contessa has brought this action against White Pine Insurance Company ("WPIC"), seeking to collect on QYZ's general commercial liability insurance policy with WPIC. In Contessa's motion for summary judgment, he argues that WPIC had a duty to defend and indemnify QYZ in the state court action because the alleged and actual facts brought the action under QYZ's coverage. Accordingly, Contessa argues, WPIC breached its duty and is liable to pay the underlying award, up to the $1,000,000.00 limit of the policy. WPIC refutes these points, arguing that both the alleged and the actual facts show that the policy does not cover this incident. In the alternative, WPIC argues that the <u>Coblentz</u> agreement cannot be enforced due to collusion between QYZ and Contessa during the arbitration. For the reasons laid out below, WPIC's motion for summary judgment is denied and Contessa's is granted.

## BACKGROUND

### I. <u>Facts Regarding the Accident on July 26, 2018</u>

The following uncontested facts were found by the Arbitrator and incorporated into the state circuit court's final judgment. Final Judgment at 2, ECF No. 50-4 (May 8, 2024) ("Final Judgment"). On July 26, 2018, Mr. Palma was returning to QYZ after completing a delivery for the restaurant. Binding Arbitration Award at 2–3, ECF No. 50-3 (May 8, 2024) ("Arbitration"). Although he should have taken Interstate 295 northbound, he accidentally joined the interstate driving southbound. <u>Id.</u> Mr. Contessa was on Interstate 295, driving his 2009 Triumph motorcycle southbound, when Mr. Palma joined the interstate. <u>Id.</u> Shortly before the Buckman Bridge, Mr. Palma cut across several lanes of traffic in an attempt to make an illegal U-Turn and join Interstate

---

[1] A <u>Coblentz</u> agreement, through assignment, allows an injured party to sue on behalf of a third party to enforce an insurance claim possessed by the third party. <u>See</u> <u>infra</u> p. 5.

Case No. 3:23-cv-00487-JAR-PDB

295 northbound prior to the bridge.  Id.  During this maneuver, however, Mr. Palma struck Mr. Contessa and caused his eventual death.  Id.

QYZ is a Chinese restaurant owned and operated by Ms. Zheng.  Arbitration at 5.  The restaurant is primarily take-out—80% of QYZ's business is either take-out or delivery—and of the four tables available for sit-down, one is often occupied by Ms. Zheng's unattended children.  Id. at 5–6.  In general, QYZ performs approximately ten to thirty deliveries per day, most of which are carried out by Ms. Zheng.  Id. at 6.  Aside from Ms. Zheng, the restaurant officially employed three people: Ms. Zheng's parents who worked in the kitchen, and Mr. Horning.  Id. at 5–6.  Of the seventy-seven hours each week that QYZ is open, Mr. Horning only worked forty, leaving only Ms. Zheng to work the front of the restaurant and make deliveries during the remaining thirty-seven hours.  Id. at 12.

Mr. Palma lived nearby and was a regular at QYZ, visiting more than three to four times a week.  Arbitration at 6–7.  During these visits, Mr. Palma would remain at the restaurant anywhere from forty minutes to two hours and would help babysit Ms. Zheng's children either at the restaurant or in his own home.  Id.  Ms. Zheng testified that Mr. Palma was never paid for babysitting and that he was never asked to do any deliveries other than the one at issue here.  Id. at 7.  Mr. Palma's wife, however, testified that Ms. Zheng would regularly contact Mr. Palma and request assistance with deliveries and babysitting.[2]  Id. at 7–8.  Further, Mrs. Palma testified that

---

[2] Mr. Palma died prior to being deposed for this case due to reasons unrelated to the incident at hand.  Arbitration at 6 n.1.  Accordingly, the tribunal did not have an account of the events from him personally.  Id.

Case No. 3:23-cv-00487-JAR-PDB

Ms. Zheng would pay Mr. Palma in cash for making deliveries and that Ms. Zheng would bring Mr. Palma food in return for babysitting.  Id.[3]

Regarding the delivery which led to Mr. Contessa's death, Ms. Zheng testified that she was very busy that day, and that Mr. Palma volunteered to do the delivery.  Arbitration at 7–8.  Further, Alex Zheng, one of Ms. Zheng's children, accompanied Mr. Palma.  Id.  No explanation was provided for Alex's presence, nor why Mr. Horning was not assigned the delivery, as Mr. Horning was working at the time.  Id. at 7–9.

## II.    Insurance Policy and WPIC's Refusal to Defend

At the time of the incident, QYZ held a valid insurance policy with WPIC that covered "Commercial Property Coverage" as well as "Commercial General Liability."  White Pine Insurance Company Policy at 3, ECF No. 49-2 (May 8, 2024) ("Policy").  Once QYZ was served by Contessa, WPIC investigated to determine whether the policy applied.  Coverage Disclaimer at 1–3, ECF No. 49-3 (May 8, 2024) ("WPIC Denial of Coverage").  Contessa's amended complaint alleged that the incident occurred "near the intersection of I-295 South and US Highway 17" and that Mr. Palma "was operating his vehicle in the course and scope of his employment, at the direction of, or as the agent for Defendant, Qian Y. Zheng Inc."  Underlying Amended Complaint at 2–3, ECF No. 50-1 (May 8, 2024).  While WPIC confirmed the location of the crash, Ms. Zheng informed WPIC that Mr. Palma was a volunteer, not an employee.  WPIC Denial of Coverage at 3.

Relying on the information from the investigation, WPIC denied coverage on two grounds. WPIC Denial of Coverage at 5.  First, WPIC referenced the "Aircraft, 'Auto' or Watercraft"

---

[3] WPIC asserts this testimony is not based on personal knowledge, and that the only credible testimony is Ms. Zheng's assertion that Mr. Palma was never paid.  Def.'s Mot. for Summ. J. at 22, ECF No. 51 (May 8, 2024) ("WPIC MSJ").

Case No. 3:23-cv-00487-JAR-PDB

exclusion ("Auto Exclusion") which provides that bodily injury arising out of the operation of an automobile[4] by any "insured"[5] is not covered by the policy.  Id. at 2–3.  WPIC found that Mr. Palma's status of volunteer qualified him as an "insured," and thus the exclusion of coverage applied.  Id.  Second, WPIC referenced the "Limitation of Coverage to Designated Premises, Project Or Operation" endorsement (the "Endorsement").  Id. at 3–4.  WPIC found that the Endorsement limits coverage to injuries occurring on the premises listed in the Endorsement's Schedule, because only a premises, not a project or operation, was designated.  Id.  Accordingly, WPIC concluded, Mr. Contessa's injury was not covered because the incident did not occur on the premises.  Id.  Based on these two grounds, WPIC refused to defend or indemnify QYZ, and the case proceeded absent its involvement.

### III.    Coblentz Agreement and Arbitration Proceedings

Prior to arbitration, QYZ and Contessa entered into a Coblentz Agreement.  Settlement Agreement at 4–5, ECF No. 6-6 (Apr. 27, 2023) ("Coblentz Agreement").  Coblentz agreements stem from Coblentz v. American Sur. Co. of New York, 416 F.2d 1059 (5th Cir. 1969), which permits the assignment of rights to enforce a breach of insurance contract claim to another party. These agreements arise when the insurance company fails to defend the insured, the insured settles the dispute, and the insured allows the injured third party to sue the insurance company on a theory of bad faith.  See Cawthorn v. Auto-Owners Ins. Co., 791 F. Appx. 60, 64 (11th Cir. 2019).  "In those circumstances, the insured is left unprotected and may enter into a reasonable settlement agreement with the third-party claimant and consent to an adverse judgment for the policy limits

---

[4] It is undisputed that Mr. Palma's vehicle qualifies as an "auto" as described by the exclusion.

[5] For the purposes of the policy, an "insured" is an employee or volunteer worker of QYZ.  Policy at 134.  There are a few additional categories of individuals that qualify as an "insured," but those are not at issue here.

Case No. 3:23-cv-00487-JAR-PDB

that is collectable only against the insurer." Perera v. U.S. Fidelity and Guar. Co., 35 So. 3d 893, 900 (Fla. 2010).

The Coblentz agreement between QYZ and Contessa referred the issues of liability and damages to binding arbitration, agreed the amount to be found by the Arbitrator would be fair and reasonable as a settlement, and assigned QYZ's rights against WPIC to Contessa in the event of an award for Contessa. Coblentz Agreement at 4–5. Further, the agreement required QYZ to cooperate with Contessa's prosecution of such legal action against WPIC and required Contessa to deliver to QYZ a full and complete release of any liability for Mr. Contessa's death. Id.

The arbitration hearing occurred on January 26, 2023. Final Judgment at 1. David Brecher, Esq. ("Mr. Brecher") presided and issued a final decision in accordance with Rule 1.830(c)(1) of the Florida Rules of Civil Procedure. Id. The hearing took place over Zoom, and included live testimony from Eric Contessa, Julie Contessa, an economist for Contessa, and the officer who initially interviewed Mr. Palma at the scene of the accident. Arbitration at 2. Mr. Brecher considered this testimony, along with additional evidence and recorded testimony from QYZ witnesses such as Ms. Zheng and Mr. Horning. See id.

In his 21-page decision, Mr. Brecher decided three issues: (1) the status/relationship of Victor Palma to QYZ; (2) liability; and (3) damages. Final Judgment at 1–2. First, Mr. Brecher found that Mr. Palma was an agent of QYZ, relying on testimony that he was paid cash and received other benefits from that agency relationship. Id. at 2. Second, Mr. Brecher found that Mr. Palma was acting in the course and scope of that agency relationship, but not as an employee, and was negligent for causing the collision and Mr. Contessa's death. Id. Finally, Mr. Brecher found that Contessa suffered damages as a direct and proximate result of Mr. Palma's negligence, and that those damages amounted to $499,389.10 in economic damages and $12,000,000.00 in

Case No. 3:23–cv–00487-JAR-PDB

non-economic damages.  Id.  The state circuit court incorporated these findings of fact and conclusions of law into its final judgment and ordered payment by QYZ.  Id. at 2–3.

Pursuant to the assignment of rights in the Coblentz agreement, Contessa filed the present action, seeking to enforce the final judgment against WPIC.  See Am. Compl., ECF No. 6 (Apr. 27, 2023).  Contessa brings two counts: first that WPIC breached its duty to defend, and second that WPIC breached its duty to indemnify.  Id. at 6–9.[6]  The parties conducted discovery, and each filed motions for summary judgment.  Def.'s Mot. for Summ. J., ECF No. 51 (May 8, 2024) ("WPIC MSJ"); Contessa's Mot. for Summ. J., ECF No. 57 (May 17, 2024) ("Contessa MSJ"). The court now considers these motions.

**DISCUSSION**

**I.**   **Duty to Defend**

Under Florida law, an insurer has a duty to defend its insured against any legal action that arises when the complaint alleges facts that fairly and potentially bring a suit within policy coverage.  Jones v. Fla. Ins. Guar. Ass'n, 908 So. 2d 435, 442–43 (Fla. 2005).  The insurer has no duty, however, when "the pleadings show the applicability of a policy exclusion."  State Farm Fire & Cas. Co. v. Tippett, 864 So. 2d 31, 35 (Fla. 4th DCA 2003).

WPIC asserts that two exclusions apply: first that the Endorsement precludes coverage of any off-premises incidents, and second that the auto exclusion excludes coverage for incidents involving automobiles controlled by an "insured."  WPIC MSJ at 16, 20.  Contessa contends the Endorsement covers incidents that arise from the operation of the restaurant such as this, and that

---

[6] Initially, Contessa included a third count, alleging bad faith by WPIC.  Am. Compl. at 11.  The court, however, dismissed this count.  Order granting Def.'s Mot. to Dismiss Count III, ECF No. 21 (Oct. 13, 2023).

Case No. 3:23-cv-00487-JAR-PDB

Mr. Palma was not an "insured," thereby making the auto exclusion inapplicable.  Contessa MSJ

at 7, 12.  The court considers each of these arguments in turn.

### A. The Endorsement does not unequivocally convert the policy to a premises liability policy

The Endorsement at issue is a modification of the commercial general liability coverage.

Policy at 157.  As written, the policy covers any bodily injury and property damages caused by an

"occurrence" that takes place in the "coverage territory."[7]   See Policy at 125, 127.  The

Endorsement substitutes in the following language:

> **b.** This insurance applies to "bodily injury" and "property damage" caused by an
> "occurrence" that takes place in the "coverage territory" only if:
>> **(1)** the "bodily injury" or "property damage":
>>> **(a)** Occurs on the premises shown in the Schedule or the grounds
>>> and structures appurtenant to those premises; or
>>> **(b)** Arises out of the projection or operation shown in the Schedule.

Policy at 157.  The Schedule mentioned is on the same page and lists the location at which QYZ

operates.  Id.  It then has a section for "Project Or Operation" but the section is blank.  Id.

Nevertheless, the Schedule accounts for this possibility and at the bottom a line states that

"[i]nformation required to complete this Schedule, if not shown above, will be shown in the

Declarations."  Id.  The Declarations of the policy do not specifically mention the Endorsement;

they do, however, refer to QYZ as a restaurant.  Id. at 97.

WPIC argues that the Schedule of the Endorsement only lists the restaurant's physical

premises; thus, the Endorsement limits the policy's applicable range to incidents occurring at that

location.  WPIC MSJ at 8–12.  Although the Schedule has a section for "Project or Operation,"

---

[7] Here, the coverage territory includes the United States of America, Puerto Rico, and Canada.
Policy at 137.  There are a few additional exceptions that would allow for coverage anywhere in
the world; those exceptions, however, are not pertinent to the facts of this case.  See id.

Case No. 3:23-cv-00487-JAR-PDB

WPIC contends that the policy must be interpreted not to include any projects or operations because the section is left blank, and no declaration specifically alters the Endorsement.  Id. Contessa argues that the policy provides general liability coverage, and that a reasonable person could interpret the Endorsement to include any normal project or operation of a restaurant.  See Contessa MSJ at 7–8.  Thus, Contessa concludes that because an incident that occurs during a delivery arises out of the operation of a restaurant, the incident is covered.  Id. at 9.

Under Florida law, an endorsement may only convert a commercial general liability policy to a premises liability policy if the language is clear and unequivocal.  See Szczeklik v. Markel Intern. Ins., 942 F. Supp. 2d 1254, 1262–63 (M.D. Fla. 2013) (citing American Empire Surplus Lines Ins. v. Chabad House of North Dade, Inc., 771 F. Supp. 2d 1336, 1343 (S.D. Fla. 2011)); cf. Parliament Ins. v. Bryant, 380 So. 2d 1088, 1089 (Fla. 3d DCA 1980) (finding no coverage for an accident occurring away from the insured's premises where a designated premises endorsement and additional, clear, exclusionary language were written into the policy).  To determine if language is clear and unequivocal, courts have considered factors such as other language that may cause ambiguity and the location of the language converting the policy.  See, e.g., Dash Messenger Service, Inc. v. Hartford Ins., 221 Ill. App. 3d 1007 (1991) (concluding that by defining the coverage territory separately from the premises, ambiguity was raised as to whether off-premises incidents were covered); American Guar. & Liab. Ins. v. 1906 Co., 129 F.3d 802, 806 (5th Cir. 1997) (concluding that a designated premises endorsement, specifically incorporated into the policy on the declarations page, put insureds on notice that coverage was limited to certain premises).

Here, the policy defines the coverage territory to include the United States of America, Puerto Rico, and Canada.  Policy at 137.  Further, the Endorsement is embedded on page 157 of

OPINION AND ORDER - 9

Case No. 3:23-cv-00487-JAR-PDB

the 164-page policy.  Id. at 157.  The declaration identifying QYZ as a restaurant and providing

for "Commercial Property Coverage" and "Commercial General Liability Coverage" is on page 3.

Id. at 3.  Finally, the "Commercial General Liability Declaration" on page 97 makes no mention

of a conversion to a premises liability policy and identifies QYZ as a "Restaurants-No Al, w/Table

Service."  Id. at 97.

  Although the Endorsement could be read to convert the policy to a premises liability policy,

it fails to do so unequivocally.  First, the Endorsement is the policy's only mention of limiting

coverage to the premises and contradicts the references throughout to general liability coverage.

Second, the Schedule is ambiguous.  While WPIC's interpretation that only specifically designated

projects or operations are covered is arguable, the inclusion of the line at the bottom of the

Schedule which explicitly states that the declarations can supplement the Schedule creates

ambiguity.   Nowhere does the Endorsement say, as WPIC interprets, that supplemental

information in the declarations must specifically reference the Endorsement.  Further, previous

courts have found similar language to be ambiguous, finding that the description of a business

from the declarations should be read into a blank section of the Schedule.  See, e.g., Szczeklik,

942 F. Supp. 2d at 1262–63 (interpreting a blank schedule for "project" to designate "distributor"

as a project because the declarations described the business as distribution).

  WPIC asserts that the extension of coverage to all operations renders the designation of a

specific premises meaningless.  WPIC MSJ at 11–12.  This argument, however, is without merit.

By the plain language of the Endorsement, coverage exists for all incidents occurring on the

premises, or incidents that arise out of the project or operation listed.  Policy at 157.  If no premises

is listed, then incidents occurring on the premises which are unrelated to the business are not

covered.  See, e.g., Capitol Indem. Corp. v. Ashanti, 28 F. Supp. 3d 877, 882 (D. Minn. 2014)

Case No. 3:23-cv-00487-JAR-PDB

(concluding that a policy which covered a project but not a premises did not cover an injury that was unrelated to the business but occurred on the premises in an area unrelated to the business). Thus, the designation of the premises expands coverage to the entire premises without regard to the use of said area, giving meaning to the designation.

In the light of the foregoing, the court concludes that the Endorsement does not limit coverage to only incidents which occur on the premises. Rather, the Endorsement provides coverage for incidents which occur within the coverage area that arise from the operation of a restaurant. The court concludes, and WPIC does not challenge, that the incident here arose from the operation of a restaurant, and thus the Endorsement does not preclude coverage.

## B. Auto Exclusion

WPIC asserts that because the complaint fails to allege that Mr. Palma was compensated, he is a volunteer worker, the auto exclusion applies to the incident, and WPIC had no duty to defend QYZ. WPIC MSJ at 16. Contessa argues, however, that simply alleging that Mr. Palma was an agent of QYZ is sufficient to trigger the duty. Contessa MSJ at 12, 21.

The Eleventh Circuit recently summarized the relevant law regarding a duty to defend:

> The duty to defend is a broad one, broader than the duty to indemnify, and "[t]he merits of the underlying suit are irrelevant." Mid-Continent Cas. Co. v. Royal Crane, LLC, 169 So. 3d 174, 181 (Fla. 4th DCA 2015). We determine whether an insurer has a duty to defend its insured based only on "the eight corners of the complaint and the policy," id. at 182, and only as the complaint's alleged facts are "fairly read," Fun Spree Vacations, Inc. [v. Orion Ins. Co.], 659 So. 2d [419] at 421 [(Fla. 3d DCA 1995)]. The "facts" we consider in evaluating the duty to defend come solely from the complaint, regardless of the actual facts of the case and regardless of any later developed and contradictory factual record. Jones, 908 So. 2d at 442–43. "Any doubts regarding the duty to defend must be resolved in favor of the insured," id. at 443, and "where a complaint alleges facts that are partially within and partially outside the coverage of an insured's policy, the insurer is not only obligated to defend, but must defend that entire suit," Sunshine Birds & Supplies, Inc. v. U.S. Fid. & Guar. Co., 696 So. 2d 907, 910 (Fla. 3d DCA 1997).

Case No. 3:23-cv-00487-JAR-PDB

Travelers Indem. Co. of Conn. v. Richard McKenzie & Sons, Inc., 10 F.4th 1255, 1261 (11th Cir.

2021).  Nevertheless, "if the pleadings show the applicability of a policy exclusion, the insurer has

no duty to defend."  Keen v. Fla. Sheriffs' Self-Ins. Fund, 962 So. 2d 1021, 1024 (Fla. 4th DCA

2007) (citing Reliance Ins. Co. v. Royal Motorcar Corp., 534 So.2d 922, 923 (Fla. 4th DCA 1988)).

Here, the complaint uses expansive language to describe the relationship between Mr.

Palma and QYZ.  Specifically, it alleges that Mr. Palma "was operating his vehicle in the course

and scope of his employment, at the direction of, or as the agent for Defendant, Qian Y. Zheng

Inc."  State Circuit Court Second Am. Compl. at § 14, ECF No. 6-3 (Apr. 27, 2023) ("Second Am.

Compl.").  This encompasses all manner of relationships between Mr. Palma and QYZ, including

employee, volunteer, or agent.

The auto exclusion excludes coverage for "'[b]odily injury' or 'property damage' arising

out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft

owned or operated by or rented or loaned to any insured."  Policy at 128.  The incident at hand

certainly qualifies as bodily injury arising out of the use of an auto; therefore, the operative

question is whether Mr. Palma is "any insured."  Relevant to this case, the policy defines volunteer

workers and employees as "insured," but makes no mention of agents who are neither volunteers

nor employees.  Id. at 134.  Therefore, while the exclusion applies to agents who are volunteers or

employees, the exclusion would not apply to agents of QYZ who are paid but not employees.

Here, the complaint alleges that Mr. Palma was an agent of QYZ but does not specify

whether he was a paid agent.  Second Am. Compl. at § 14.  Instead, the complaint leaves open the

possibility that Mr. Palma was an employee, volunteer, or paid agent.  "If the allegations of the

complaint leave any doubt as to the duty to defend, the question must be resolved in favor of the

insured."  Mid-Continent Casualty Co. v. Royal Crane, LLC, 169 So. 3d 174, 181 (Fla. 4th DCA

Case No. 3:23-cv-00487-JAR-PDB

2015) (quoting Lime Tree Vill. Cmty. Club Ass'n v. State Farm Gen. Ins., 980 F.2d 1402, 1405 (11th Cir. 1993)). Thus, the court concludes that based on the eight corners of the complaint and the policy, WPIC had a duty to defend the lawsuit against QYZ as there was a possibility that Mr. Palma was a paid agent and thus not subject to the exclusion.

WPIC argues that even if the complaint alleges sufficient facts to trigger the duty, extrinsic evidence from WPIC's investigation confirms that Mr. Palma was a volunteer and thus the exclusion applies. WPIC MSJ at 20–24. Contessa asserts that this extrinsic evidence cannot be considered when evaluating whether WPIC had a duty to defend. Contessa MSJ at 12.

Florida courts have established some "natural exceptions" to the rule that the duty to defend is determined solely by the allegations in the claimant's complaint. Higgins v. State Farm Fire & Cas. Co., 894 So. 2d 5, 10 n.2 (Fla. 2004). "[I]n special circumstances, a court may consider extrinsic facts if those facts are undisputed, and, had they been pled in the complaint, they clearly would have placed the claims outside the scope of coverage." Stephens v. Mid-Continent Cas. Co., 749 F.3d 1318, 1323 (11th Cir. 2014) (emphasis added). Those instances "are best seen as exceptional cases in which courts have crafted an equitable remedy when it is manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage." First Specialty Ins. v. 633 Partners, Ltd., 300 F. App'x 777, 786 (11th Cir. 2008) (emphasis added).

During the investigation, Ms. Zheng informed WPIC that Mr. Palma was a volunteer and was not compensated. WPIC Denial of Coverage at 3. Nevertheless, Mrs. Palma testified that Mr. Palma was compensated, both in cash and in food. Arbitration at 7–8. Whether or not Mr. Palma was compensated is a key question in this case, thus it cannot be said that the extrinsic facts that WPIC relied upon are "undisputed" as required by Stephens. Accordingly, the extrinsic evidence

Case No. 3:23-cv-00487-JAR-PDB

that Mr. Palma was a volunteer must be excluded for the purposes of considering whether WPIC had a duty to defend.

WPIC asserts that Mrs. Palma's testimony cannot be considered because the complaint failed to include the fact that Mr. Palma was compensated. WPIC MSJ at 20–25. This argument, however, is without merit. As the court has already determined, the complaint sufficiently pled facts giving rise to a duty to defend as it alleged that Mr. Palma was an "agent." Supra p. 13. Contested facts from interested parties do nothing to change that. "[W]here a complaint alleges acts that are partially within and partially outside the coverage of an insured's policy, the insurer is not only obligated to defend, but must defend the entire suit." Sunshine Birds & Supplies, Inc. v. U.S. Fid. & Guar. Co., 696 So. 2d 907, 910 (Fla. 3d DCA 1997). Contessa's pleading that Mr. Palma was an agent sufficiently triggered WPIC's duty to defend, regardless of any extrinsic evidence, and WPIC breached its duty by refusing to do so as neither the auto exclusion nor the Endorsement prevented coverage.

## II.   <u>Duty to Indemnify</u>

WPIC contends that even if a duty to defend existed, the actual facts before the court establish that there is no duty to indemnify because the auto exclusion applies to this incident. WPIC MSJ at 20. Unlike the duty to defend, an insurance company's duty to indemnify "is narrower and is determined by the underlying facts adduced at trial or developed through discovery during the litigation." U.S. Fire Ins. v. Hayden Bonded Storage Co., 930 So. 2d 686, 691 (Fla. 4th DCA 2006). In other words, it is the actual facts that determine whether the insurance policy covers the relevant incident. Stephens, 749 F.3d at 1324. WPIC argues that the evidence which has been provided to this court, not the state court which originally heard the matter between Contessa and QYZ, definitively establishes that the auto exclusion applies. WPIC MSJ at 20.

Case No. 3:23-cv-00487-JAR-PDB

Contessa asserts that the court is bound by the facts found by the state court, which adopted the arbitrator's findings of fact and conclusions of law. Contessa MSJ at 17–21. One of these facts was that Mr. Palma was paid for his work delivering food for QYZ. Arbitration at 12. WPIC asserts that payment was not a material fact in the arbitration as it is not required for finding that someone serves as an agent. WPIC MSJ at 20–25. Thus, WPIC argues, the court is able to make its own determination regarding the evidence and the "only competent and reliable testimony . . . unequivocally establishes that QYZ neither paid, nor intended to pay, [Mr.] Palma." WPIC MSJ at 20.

When an insurance company breaches its duty to defend, a prior judgment, if without fraud or collusion, "is conclusive against the indemnitor as to all material questions therein determined." Jones v. Florida Ins. Guar. Ass'n, 908 So. 2d 435, 450 (Fla. 2005) (quoting Grain Dealers Mut. Ins. v. Quarrier, 175 So. 2d 83, 86 (Fla. 1st DCA 1965)); see also Sidman v. Travelers Cas. & Sur., 841 F.3d 1197, 1203–04 (11th Cir. 2016). This does not prevent an insurer from raising questions regarding coverage or fraud, but "factual issues, which were interwoven with and a necessary and integral part of the determination of judgment in the underlying action are precluded from further review and subsequent collateral attack." Jones, 908 So. 2d at 450 (citing Quarrier, 175 So. 2d at 86).

In determining the status/relationship of Victor Palma to QYZ, Mr. Brecher determined that Mr. Palma was paid cash for his work delivering food for QYZ. Arbitration at 12. Mr. Brecher came to this conclusion after considering the evidence and finding that although Ms. Zheng and Mr. Horning testified otherwise, their testimony was not as credible as Mrs. Palma's as they were interested parties. Id. at 11–12. Mr. Brecher relied on this finding several times, mentioning it as evidence of an agency relationship throughout his consideration. See, e.g., Arbitration at 9–10

OPINION AND ORDER - 15

Case No. 3:23-cv-00487-JAR-PDB

("[I]t is clear that Mr. Palma accepted the undertaking because he made the delivery and allowed Ms. Zheng's son to accompany him. Furthermore, Mrs. Palma confirmed that her husband often made deliveries for [QYZ] and was paid cash for his work."); id. at 10–11 ("These remaining factors weigh in favor of finding an agency relationship. . . . For at least a period of months, Mr. Palma was paid cash for his assistance in making deliveries whenever Ms. Zheng summoned him for help.").

Based on Mr. Brecher's findings of fact and conclusions of law, and the state circuit court's final judgment, the court concludes that the issue of Mr. Palma's payment was "interwoven with and a necessary and integral part of the determination." First, Mr. Brecher specifically addressed the evidentiary dispute in the opinion, signaling the issue was a necessary component of his ultimate conclusion. Arbitration at 12. Second, Mr. Brecher mentioned the fact when considering whether Mr. Palma was an agent, and when determining whether Mr. Palma was acting in the course of his duties. Id. at 9–11. The circuit court similarly found the issue of payment to be an important fact, identifying it as one of the few facts enumerated in the final judgment. Final Judgment at 2. Although not explicit, these pieces indicate the importance of Mr. Palma's payment to the resolution of the underlying dispute.

Furthermore, payment, and the method of payment, are key factors in determining whether an actual agency relationship exists. As laid out by Mr. Brecher, "[e]ssential to the existence of an actual agency relationship is (1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." Villazon v. Prudential Health Care Plan, Inc., 843 So. 2d 842, 853 n.10 (Fla. 2003) (citation omitted); see also Arbitration at 9. Although, under this test, payment is not required to establish an actual agency relationship, see Burns v. Sams, 458 So. 2d 359, 360 (Fla. 1st DCA

OPINION AND ORDER - 16

Case No. 3:23-cv-00487-JAR-PDB

1984), payment, and the method it is given, are often considered an important piece of evidence when evaluating the question, see, e.g., Continental Divide Ins. v. Rumba Tours, LLC, 2023 WL 5039725, at *5 (S.D. Fla. Aug. 8, 2023) (finding the method of payment to be "important evidence that suggests the parties intended to create a master-servant relationship").[8]

Given the importance of the payment, and Mr. Brecher's reliance on the payment, the court concludes that the fact that Mr. Palma was paid was a necessary and integral part of the determination. Thus, WPIC is precluded from making a collateral attack on the Mr. Brecher's finding regarding Mr. Palma's payment; accordingly, the actual facts before the court reflect that Mr. Palma was paid as an agent but was not an employee. As indicated previously, the auto exclusion does not apply to paid agents, only to employees and volunteers. See supra p. 12. Accordingly, the court finds that based on the actual facts, WPIC had a duty to indemnify QYZ and is in breach of said duty.

## III.   The Coblentz Agreement was Reasonable and in Good Faith

Finally, WPIC argues that Contessa has failed to demonstrate that the settlement is reasonable and was made in good faith, as is required for Coblentz agreements, because there is evidence of collusion between QYZ and Contessa. Def.'s Am. Resp. in Opp'n to Pl.'s Mot. for Summ. J. at 18–19, ECF No. 63 (June 10, 2024) ("WPIC Resp."). Contessa asserts that WPIC's narrative of collusion is unfounded, and that the award set by the binding arbitration was

---

[8] The only example WPIC relies upon of an actual agency relationship existing without payment is that of an unpaid child assisting in a family business. See Def.'s Resp. in Opp. to Pl.'s Mot. for Summ. J. at 17, ECF No. 32 (Feb. 7, 2024) (citing Fernandez v. Valle, 364 So. 2d 835, 836 (Fla. 3d DCA 1978)). This is easily distinguishable from the facts here, where no familial relationship exists.

Case No. 3:23-cv-00487-JAR-PDB

reasonable. Pl.'s Reply Mem. in Supp. of Pl.'s Mot. for Summ. J at 2–3, ECF No. 65 (June 18, 2024).[9]

To enforce a Coblentz agreement, the assignee—here, Contessa—must bring an action against the insurer and prove "(1) the damages are covered by the policy; (2) the insurer wrongly refused to defend; and (3) the settlement is reasonable and made in good faith." Mid-Continent, 169 So. 3d at 180 (quoting U.S. Fire Ins., 930 So. 2d at 690–91). Here, as the court has already established, the first two prongs have been met. Supra p. 17. Thus, the only remaining question is whether the settlement is reasonable and made in good faith.

Courts in Florida have acknowledged the paradox inherent in Coblentz agreements. On one hand, when an insured party settles for an amount that it will not have to pay, the settlement "may not actually represent an arm's length determination of the worth of the plaintiff's claim." Sidman, 841 F.3d at 1202 (quoting Steil v. Fla. Physicians' Ins. Reciprocal, 448 So. 2d 589, 592 (Fla. 2d DCA 1984)). Nevertheless, there is a policy interest in enforcing these agreements as they encourage settlement. Id. Consequently, "Coblentz agreements [are] not [] reviewed under 'the ordinary standard of collusion or fraud.'" Id. at 1203. Instead, courts are directed to "look to evidence of an unreasonable settlement amount and of bad faith on the part of the negotiating parties as proxies for collusion or fraud." Id. (citing Steil, 448 So. 2d at 592). Here, WPIC does

---

[9] WPIC additionally argues that Contessa failed to make a prima facie showing that the Coblentz agreement was reasonable and made in good faith. WPIC Resp. at 19. The court disagrees. Under Florida law, the claimant must produce "evidence sufficient to make a prima facie showing of reasonableness and lack of bad faith, even though the ultimate burden of proof will rest upon the carrier." Chomat v. Northern Ins. Co. of New York, 919 So. 2d 535, 537 (Fla. 3d DCA 2006) (quoting Steil, 448 So. 2d at 592). In Contessa's Motion for Judgment on the pleadings, he outlines the evidence supporting the reasonableness of the agreement. Contessa MJP at 8–9. Further, Contessa presented testimony from an expert that spoke to the reasonableness of the arbitrator's decision. Spohrer Deposition, ECF No. 54-2 (May 10, 2024). Thus, the court concludes that Contessa has satisfied his burden as the settlement reflects the decision of a neutral arbitrator, and the evidence suggests the arbitration was reasonable and conducted in good faith.

Case No. 3:23-cv-00487-JAR-PDB

not argue that the settlement amount is unreasonable, only that collusion was present.  See WPIC

Resp. at 18–20; see also Report of Defendant, White Pine Insurance Company's Expert, John Bond

Atkinson, Esquire, ECF No. 55-1 (May 10, 2024) ("Atkinson Report").  Accordingly, the court

primarily focuses on evidence of bad faith on the part of the negotiating parties.

　　　While not an exhaustive list, bad faith claims include the filing of false claims, collusion

to share the recovery, and a willingness to accept a judgment of any amount.  See Chomat v.

Northern Ins. Co. of New York, 919 So. 2d 535, 538 (Fla. 3d DCA 2006); Travelers Indem. Co.

of Connecticut v. Richard McKenzie & Sons, Inc., 326 F. Supp. 3d 1332, 1347 (M.D. Fla. 2018).

WPIC does not argue that any of those elements are present here.  See WPIC Resp. at 19.  Instead,

WPIC focuses on the actions of QYZ's attorney during the arbitration, arguing that the

ineffectiveness of QYZ's attorney is evidence of collusion.  Id. at 19–20.  Further, WPIC argues

that QYZ and Contessa's failure to inform the arbitrator of the Coblentz agreement "amounts to

collusion in the form of constructive fraud."  Id.

　　　To support its arguments, WPIC primarily relies on the report of its expert, John Atkinson,

who is experienced in these types of arbitration.[10]  Id. at 20.  Mr. Atkinson's report can be

interpreted to break up QYZ's deficiencies into two main categories, process deficiencies and

conduct deficiencies.  See Atkinson Report at 11–13.  Regarding process, Mr. Atkinson takes issue

with elements such as the agreement to accept the decision of the arbitrator as fair and reasonable,

and the opportunity for QYZ's counsel to obtain reimbursement for attorney's fees.  Atkinson

---

[10] Contessa filed a motion seeking to exclude or limit the testimony of Mr. Atkinson, see ECF No. 55, and WPIC filed a motion seeking to exclude or limit the testimony of Mr. Spohrer, see ECF No. 54.  The court has considered these motions, and finds they are largely mooted, but the court references Mr. Atkinson's views so that WPIC's position can be understood. Mr. Spohrer's opinions simply reflect the facts of the proceedings, and the court need not rely on his conclusory opinions.

OPINION AND ORDER - 19

Case No. 3:23-cv-00487-JAR-PDB

Report at 11. For conduct deficiencies, the report focuses on strategic decisions made by QYZ's counsel such as the decision not to call any live witnesses and not to cross-examine either of Mr. Contessa's parents after they testified regarding their pain and suffering. Id. at 13–14. The report concludes that the "Coblentz Agreement and arbitration proceeding combined to act as little more than a rubber stamp." Id. at 14.

Mr. Brecher's findings of fact and conclusions of law paint a different picture. In the arbitration, QYZ presented evidence and argued that Mr. Palma was a one-time volunteer who was not under the control of QYZ at the time of the crash. Arbitration at 4. QYZ pursued multiple theories, arguing in the alternative that even if Mr. Palma had been an agent, he no longer was one after completing the delivery, and that the negligence should rest solely upon Mr. Palma. Id. QYZ also presented testimony from Ms. Zheng and Mr. Horning advancing its theory of the case— although Mr. Brecher did not find the testimony credible due to their "interest in the outcome." Id. at 12. In summary, the arbitration clearly shows that QYZ advanced legal arguments which align with the interests of WPIC.

Strategic choices, not amounting to malpractice, are not conclusive evidence of collusion or bad faith. The procedural flaws identified by Mr. Atkinson do not amount to evidence that there was collusion to share in the recovery from WPIC. Nor is it abnormal for parties to agree to the outcome when agreeing to settle a matter before an arbitrator. Although Mr. Atkinson may question the strategic choices made during trial, QYZ's counsel did not take any actions that were shown to be outside of the norm, and QYZ advanced a well-supported, if unsuccessful, argument. Thus, considering that Contessa has presented a prima facie case, and that WPIC has failed to counter it with evidence of unreasonableness or bad faith, the court finds that the Coblentz agreement was reasonable and made in good faith.

OPINION AND ORDER - 20

Case No. 3:23-cv-00487-JAR-PDB

Absent a showing of bad faith by the insurance company, under a <u>Coblentz</u> agreement the insurer is "obligated to pay the amount of the settlement or judgement, at least within its policy limits." <u>Sidman</u>, 841 F.3d at 1202 (quoting <u>Steil</u>, 448 So. 2d at 592). Here, the policy limit is for $1,000,000.00 and no showing of bad faith by WPIC was made. Policy at 3; Order granting Def.'s Mot. to Dismiss Count III, ECF No. 21 (Oct. 13, 2023). Accordingly, since the award found by Mr. Brecher exceeds the policy limit, WPIC is liable for the limit of $1,000,000.00.

<b>CONCLUSION</b>

For the foregoing reasons, the court finds that the three prongs necessary to enforce a <u>Coblentz</u> agreement were satisfied. Accordingly, the agreement is enforceable, and it is hereby

**ORDERED** that the defendant WPIC's Motion for Summary Judgment, <u>see</u> ECF No. 51, is denied; **ORDERED** that the plaintiff Contessa's Motion for Summary Judgment, <u>see</u> ECF No. 57, is granted; **ORDERED** that all remaining outstanding motions are denied as moot; and **ORDERED** that judgment shall be entered in favor of the plaintiff against WPIC in the above matter in the amount of $1,000,000.00 to the Estate of Vincenzo Contessa. The Clerk is directed to terminate any pending motions as moot and to close the file.

/s/ Jane A. Restani<br>Jane A. Restani, Judge[*]

Dated: September 16, 2024
New York, New York

---

[*] Judge Jane A. Restani, of the United States Court of International Trade, sitting by designation.

OPINION AND ORDER - 21